IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| JONATHAN ANDY BOYER,<br><br>Plaintiff,<br><br>v.<br><br>CHAD CARTER, a Utah Highway Patrol Trooper, in his individual capacity,<br><br>Defendant. | **MEMORANDUM DECISION AND ORDER**<br><br><br>Case No. 2:17-cv-215-DB<br><br>Judge Dee Benson |

Before the Court is Defendant's motion for summary judgment. [Dkt. 28]. The motion has been fully briefed by both parties. The Court finds oral argument unnecessary. Based upon the parties' written arguments and on the relevant facts and the law, the Court enters this Memorandum Decision and Order.

BACKGROUND

On the night of August 7, 2015, Plaintiff, Jonathan Andy Boyer was driving on Interstate 15 when one of the tires on his car became flat. [Dkt. 28 ¶2]. Mr. Boyer pulled over to the side of the freeway and called the Utah Highway patrol for assistance. [Id. at ¶5]. He told dispatch that he was located near 5300 South on I-15. [Id. at ¶6]. Defendant, Trooper Chad Carter, went

1

to that location to assist him but Mr. Boyer was not in the vicinity. He eventually located Mr. Boyer in his car off the side of I-15 near 8600 South. He pulled behind the car, which was elevated by a jack, and turned on his rear-facing lights. [Id. at ¶10]. It was about eleven o'clock at night and lightly raining. The police car dashcam video of the encounter which is the subject of this action, was submitted and has been viewed by the Court.

As Trooper Carter approached the car, Mr. Boyer rolled down his window and told him that he needed help changing his tire. [Id. at ¶11]. He said he did not have the right tools so Trooper Carter offered to let him use his. [Id. at ¶12]. Mr. Boyer said that he told dispatch he was at 5300 South but that he actually was not sure where he was. He said he and his wife, who was in the passenger seat, were on their way home from the Desert Edge Brewery. [Id. at ¶13]. As Trooper Carter, a certified drug recognition expert, talked to Mr. Boyer, he noticed that his eyes were blood shot and when he rolled down his window, he smelled what the trooper believed was an odor of an alcoholic beverage. [Id. at ¶14, 20]. When Trooper Carter told Mr. Boyer that he smelled like alcohol, Mr. Boyer responded, "Oh, I do?" [Id. at ¶28].

Trooper Carter instructed Mr. Boyer to move his car farther away from the concrete wall on the side of the freeway to allow adequate room to change the tire. [Id. at ¶23]. Mr. Boyer did so without first removing the jack which was under the passenger side of the vehicle, causing the car to fall from its perch. Trooper Carter noticed that Mr. Boyer did in fact have the tools for changing tires that came with the car. As he changed the tire using Trooper Carter's tools, the trooper became concerned about Mr. Boyer's coordination and faculties. For instance, he began putting the spare tire on backward until Trooper Carter corrected him. [Id. at ¶ 24]. His speech

was somewhat slow and sounded slurred. After the tire was changed, Mr. Boyer put the flat tire in his trunk. Trooper Carter asked to see Mr. Boyer's drivers license because by that time he was suspicious that Mr. Boyer may be impaired. [Id. at ¶¶25-26]. Trooper Carter testified at his deposition about some of the indications upon which he based his suspicion that Mr. Boyer may have been under the influence:

> A. [He] had poor coordination. It seemed too difficult for him to change the tire.
>
> Q. Explain that for me. What do you mean?
> A. First off, I noted that he had the tool kit that came with the car, he had the tire iron that came with the car, but he told me that it was the wrong size or something. When he used my star wrench, my star wrench has four sockets on it, each a different size. He tried each socket twice before he found the correct size. So he tried one size, tried the next size, tried the next size, tried the next size. Do you know what I mean?
>
> Finally he found the correct socket, but every time he tried to take off the next lug nut he would hit the rubber of the wheel, of the tire. He would hit the hub cap. He would make contact with the lug nut but miss; you know what I mean? It took him several tries to even get the wrench onto the lug nut properly before he was able to take it off. That happened with all of the lug nuts. After that –
>
> Q. Do you remember how many lug nuts there were?
> A. I don't. Probably five. After that he removed the flat tire and went to put the spare tire on but he started putting it on backwards. And he even started tightening one of the lug nuts on the hold before I told him that it was on backwards, and then he turned it around and put it back on. He had poor coordination in that similar manner throughout the entire stop I had with him.
>
> At one point he – when I arrived on scene he had like the jack that came with the car up underneath the car. And it was supporting some of the car's weight, and then there wasn't enough room between the car and the concrete wall for my star wrench to fit in there. So I told him that he had to make more room for that by reversing the car and backing further away from the wall. I don't think I had ever seen that the jack was under the car at that point. I think he had told me but I had forgotten. He reversed with the jack still under and the car kind of fell down.

[Id. at ¶29].

Regarding Trooper Carter's observance of Mr. Boyer's slurred speech, Mr. Boyer testified at his deposition that he does have a speech impediment for which he has received speech therapy in the past. At his deposition, he stated, "I might sound like I have a frog in my throat or possibly that I need to swallow a little bit. Q. Kind of like you are slurring? A. Yes." [Id. at ¶31].

When Trooper Carter asked to see his driver's license, he asked if Mr. Boyer had been drinking. Mr. Boyer said that he had not. Trooper Carter told him he would like to conduct some field sobriety tests with him and Mr. Boyer did not object.

Trooper Carter placed Mr. Boyer through standard field sobriety tests, including a horizontal gaze nystagmus (HGN) test, a walk and turn or heel-to-toe test, and a one leg stand test. Trooper Myer arrived to serve as backup, which is standard procedure when a suspect is given field sobriety tests. [Id. at ¶39].

Trooper Carter testified at his deposition that during the horizontal gaze test, he "saw a lack of smooth pursuit in both eyes . . . I tested each eye individually and I did each eye test twice . . . They were jerking as they were moving from side to side." [Id. at ¶43]. Trooper Carter found that "Boyer exhibited a lack of smooth pursuit in both eyes, distinct and sustained nystagmus at maximum deviation for a minium of four seconds, and an onset of nystagmus prior to 45 degrees in both eyes." He observed no vertical nystagmus." [Id. at ¶ 44]. Trooper Carter determined that he had not passed. On the walk and turn test, Trooper Carter found that Mr. Boyer "lost his balance multiple times during the instruction stage and he missed heel to toe on a step. He made an improper turn and stepped off line and missed heel to toe. [Id. at ¶ 46]. During

4

the one leg stand test, Trooper Carter found that Mr. Boyer raised his arms, swayed from side to side and put his foot down several times. [Id. at ¶48]. Based on Mr. Boyer's performance, Trooper Carter determined that he had failed the field sobriety tests. [Id. at ¶49].

He then administered a portable breath test which was negative for alcohol. The result confused Trooper Carter because he suspected that Mr. Boyer was impaired by alcohol. He testified:

> I don't think I'd ever had this situation before. I've had times in the past where I've had people exhibit a lot of clues on the test and then show zero alcohol but all of them were impaired by drugs. And the interesting thing about this one was that, as I mentioned before, I thought I had smelled an alcoholic beverage and I thought it was alcohol that was causing the impairment that I saw. So when it said zero I was confused.

[Id. at ¶50].

Trooper Carter told Mr. Boyer "[Y]ou kinda sound like you're slurring a little bit, your eyes are pretty red, I told you - you kind of smell like alcohol a little bit, your coordination hasn't been too good, you drove backwards and you still had the jack on, you almost put the tire on the wrong way, your coordination doesn't look too good as far as using the wrench and stuff, so I am just trying to figure out what is going on." [Id. at ¶51].

Trooper Carter asked Trooper Myer to conduct another horizontal eye test on Mr. Boyer and he did so. Trooper Myer determined that Mr. Boyer did not pass the test. The troopers consulted with each other and Trooper Carter placed Mr. Boyer under arrest for driving under the influence. [Id. at 56].

The results of Mr. Boyer's blood and urine tests taken after his arrest were negative and the charges against Mr. Boyer were dropped. [Id. at ¶58].

Mr. Boyer filed this action pursuant to 42 U.S.C. § 1983 alleging violation of his right to be free from unreasonable search or seizure under the Fourth Amendment to the United States Constitution[1] and under sections seven and fourteen of Article I of the Utah constitution.[2] Specifically he argues that Trooper Carter lacked reasonable suspicion to detain Mr. Boyer and probable cause to arrest him for driving under the influence. Trooper Carter filed this motion for summary judgment asserting that the action should be dismissed because he is entitled to governmental immunity.

DISCUSSION

Summary judgment is appropriate where "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court finds that the material facts underlying this motion are not in dispute.

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223,

---

[1] The Fourth Amendment to the United States Constitution states:"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

[2] Article I § 7 of the Utah constitution provides that "[n]o person shall be deprived of life, liberty or property, without due process of law."
Article I § 14 of the Utah constitution states: "The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue but upon probable cause supported by oath or affirmation, particularly describing the place to be searched, and the person or thing to be seized."

231 (2009)(quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

"When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right; and (2) the constitutional right was clearly established." *Becker v. Bateman*, 709 F.3d 1019, 1022 (10th Cir. 2013). "If the plaintiff fails to satisfy either part of the two-part inquiry, the court must grant the defendant qualified immunity." *Gross v. Pritle*, 245 F.3d 1151, 1155-56 (10th Cir. 2001); *Holland v. Harrington*, 268 F.3d 1179, 1186 (10th Cir. 2001); *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001).

Qualified immunity may be denied where, "on an objective basis, it is obvious that no reasonably competent [official] would have concluded that the actions were constitutional." *Gomes v. Woods*, 451 F.3d 1122, 1134 (10th Cir. 2006). However, "'if [officials] of reasonable competence could disagree' about the lawfulness of the challenged conduct, then '[qualified] immunity should be recognized.'" *Id*. at 1136 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

In this action, Mr. Boyer challenges the legality of the expansion of the consensual encounter into a DUI investigation and his subsequent arrest.

There is no dispute between the parties that the encounter between Trooper Carter and Mr. Boyer began consentually when Mr. Boyer called for the highway patrol's help in changing his tire. *Himes*, 25 F.App'x 727, 730 (10th Cir. 2001)("because a motorist assist begins as a consensual encounter, a police officer can retain a driver's license for a short period of time without changing the consensual nature of the encounter")(citing *United States v. Madrid*, 30

F.3d 1269, 1276 (10rh Cir. 1994)). However, Mr. Boyer contends that the nature of the encounter changed once Trooper Carter asked him to perform field sobriety tests. At this point, he asserts, he was not free to go and was being illegally detained.

Trooper Carter argues he had reasonable suspicion to believe Mr. Boyer was impaired at that point and was therefore justified in detaining him and conducting the tests. Where an officer has reasonable suspicion that a driver is intoxicated, he may subject him to field sobriety tests without violating the Fourth Amendment. *Vondrak v. City of Las Cruces*, 535 F.3d 1198, 1206 (10th Cir. 2008). In determining whether an officer possessed reasonable suspicion, courts "review the totality of the circumstances and consider both the quantity of information possessed by the law enforcement officer and its reliability." *United States v. Wisniewski*, 192 F. App'x 749, 754-55 (10th Cir. 2006)).

Trooper Carter's suspicion was based on his observations that Mr. Boyer's speech was slow and sounded slurred; his eyes were bloodshot; and he smelled of what Trooper Carter thought was alcohol. Mr. Boyer told the trooper that he had just come from a brewery; had given the wrong location to dispatch and telling the trooper he did not actually know where he was. His coordination and decision making in replacing the flat tire were of concern to the trooper. Taken together, the Court finds that these observations were sufficient to give Trooper Carter reasonable suspicion to administer the field sobriety tests to Mr. Boyer.

A defendant "is entitled to qualified immunity if a reasonable officer could have believed that probable cause existed to arrest or detain the plaintiff." *Stonecipher v. Valles*, 759 F.3d 1134, 1141 (10th Cir. 2014); *Baptiste v. J.C. Penney Co.*, 147 F.3d 1252, 1256 (10th Cir. 1998)

("Even law enforcement officials who reasonably but mistakenly conclude that probable cause is present are entitled to immunity" in a section 1983 action "if a reasonable officer could have believed that probable cause existed to arrest the plaintiff")(quoting *Romero v. Fay*, 45 F.3d 1472, 1276 (10th Cir. 1995); *Johnson v. Lindon City*, 405 F.3d 1065, 1068 (10th Cir. 2005). "Probable cause exists if facts and circumstances within the arresting officer's knowledge and of which he or she has reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense.'" *Id*. (quoting *Jones v. City & County of Denver*, 854 F.2d 1206, 1210 (10th Cir. 1988)). "[P]robable cause for a warrantless arrest is determined in terms of the circumstances confronting the arresting officer at the time . . ., the validity of such an arrest is not undermined by subsequent events in the suspect's criminal prosecution such as dismissal of charges." *Wilder v. Turner*, 490 F.3d 810, 814 (10th Cir. 2007). "Probable cause only requires a probability of criminal activity, not a prima facie showing of such activity." *Id*. at 813. Probable cause is determined "from the totality of the circumstances taking into account both inculpatory as well as exculpatory evidence." *Id*. at 814. "The 'totality of the circumstances' test does not depend on whether any particular factor is innocent when considered in isolation, but on whether, taken as a whole, the facts observed by law enforcement officers indicate a fair probability of criminal activity." *United States v. Mendoza-Sorzano*, 2010 WL 2813117 at *9 (D.Utah 2010).

Based on the totality of the circumstances known to Trooper Carter at the time, the Court finds that sufficient facts existed to establish probable cause for him to arrest Mr. Boyer for DUI. The fact that Mr. Boyer's subsequent blood and urine test results later came back negative,

similarly do not negate Trooper Carter's belief at the time that probable case existed.

CONCLUSION

Because Mr. Boyer has not established a violation of his constitutional rights, Trooper Carter is entitled to qualified immunity. See *Pearson*, 555 U.S. at 231. Defendant's motion for summary judgment is hereby GRANTED.

IT IS SO ORDERED.

DATED this 27th day of June, 2018.

_____
Dee Benson
United States District Judge